**BOLT ASSOCIATES, INC., Plaintiff,**

v.

**ALPINE GEOPHYSICAL ASSOCIATES, INC. and Walter C. Beckmann, Defendants.**

Civ. A. No. 359–65.

United States District Court
D. New Jersey.

Aug. 6, 1965.

---

Toner, Crowley, Woelper & Vanderbilt, Newark, N. J., for plaintiff; by Roger L. Toner, Newark, N. J., and Robertson, Smythe, Bryan & Parmelee, Stamford, Conn., by Donald W. Robertson, Roland T. Bryan, Stamford, Conn., of counsel.

Stein & Rosen, Jersey City, N. J., for defendants; by Warren J. Kaps, Jersey City, N. J., and Irving Younger, New York City, of counsel.

WORTENDYKE, District Judge.

The verified complaint describes this action as one for breach of contract and breach of trust. It alleges that this Court has jurisdiction by reason of the diversity of citizenship between the parties, and the involvement of the jurisdictional minimum.

Plaintiff (Bolt) claims to have discovered a system for conducting ocean floor surveys, using echo sounders in which the sound source is the explosive release of air under pressure at the surface of the water. The device embodying the discovery is known by the trade

mark name of "PAR" gun; the initials standing for Pneumatic Acoustical Repeater. It is further alleged that this device is used as a sound source for seismic profiling of the ocean floor, and that the system and device constitute a secret process owned by the plaintiff. The device is employed in submarine geophysics, the seismological branch of oceanography, for the purpose of developing a profile picture of the bottom of the ocean, and of any discontinuities in the layers beneath the ocean floor. It is contended that the superiority of the device is found in its utility as a substitute for explosives as a sound source. The device is less dangerous to use than explosives, affords a greater density of sampling, and is less expensive to operate.

The complaint further alleges that in June 1961 Bolt informed Lamont Geological Observatory of Columbia University that it had developed the system in question, and that its embodiment was demonstrated by Bolt to Lamont on June 16, 1961. Following that demonstration Lamont suggested that Bolt communicate with the defendant, Walter C. Beckmann, president and director of the corporate defendant Alpine, for the purpose of inviting his interest in the device. A secret demonstration was later made of the device to Beckmann, who thereupon indicated that he would consider entering into a license agreement with the plaintiff for Alpine's manufacture and sale of Bolt's device, and its use of plaintiff's pneumatic sound source system. Negotiations ripened into a written contract which was signed by Beckmann for Alpine and associated companies, on July 19, 1961. A copy thereof is attached to the complaint and reads as follows:

"CONFIDENTIAL AGREEMENT
"I hereby agree that I have been shown the design of the Pneumatic Acoustical Repeater as developed by BOLT Associates in full confidence, and agree not to divulge the design to others, to build or use, or incorporate in the design of other devices, until a patent has been issued or denied.

Signed: Walter C. Beckmann, Pres. for Alpine Geophysical Associates and associated companies"

Dated: July 19, 1961

This agreement was written upon the letterhead of Bolt Associates and the corporate seal of Alpine is affixed thereto.

It is alleged that, in accordance with the agreement, plaintiff disclosed to Beckmann and Alpine, a working drawing containing the details of construction of the PAR gun, and a description of the process by which the gun is operated in echo sounding survey work. Alpine rented a PAR gun from plaintiff and was furnished by Bolt with a technician to operate it. The device was used by Alpine in the course of an oceanographic survey made by it, and Alpine paid the plaintiff for the use of the process and gun, as well as for the services of the technician. The previous discussions looking to a license agreement between the parties were, says plaintiff, terminated by the defendants after they had used the device in making that survey.

Plaintiff charges that the defendants, in violation of the trust and confidence reposed in them by the plaintiff, which they recognized in the confidential agreement of July 19, 1961, purposely misrepresented to the plaintiff a simulated interest in the PAR gun, and disclosed the plaintiff's trade secrets involved in the system and device to unknown third persons, in violation of their agreement not to do so. Such disclosure is alleged to have been made to Lamont and others, who have built, sold and used pneumatic sound sources utilizing in their construction and application the secret information which plaintiff had disclosed to the defendants.

The complaint further alleges that licensing negotiations, which had previously been terminated, were reopened by the plaintiff with the defendants in 1964, and that discussions between the parties at that time evoked the admission by Beckmann that Alpine had manufactured four guns, two for Lamont and two for other Universities. Plaintiff

charges that Alpine made six devices and Lamont made twenty-six. During these 1964 discussions defendants persuaded plaintiff to place one of its latest models of the device in the defendants' hands for use in testing its performance aboard one of defendants' survey ships. The license negotiations continued for a period of time, but ultimately again aborted.

It is plaintiff's contention that the license negotiations, in 1961 and again in 1964, constituted a misleading of the plaintiff by Beckmann and Alpine into the belief that a license could be acquired, and that during these negotiations Alpine increased its capitalization and made further disclosures to Lamont to plaintiff's detriment.

Plaintiff seeks damages for an alleged loss of profits in an amount in excess of $80,000, which it claims as the quantum of the unjust enrichment of the defendants resulting from their breach of the confidential and contractual relationship between them and the plaintiff. Injunctive relief is also sought by the plaintiff to prevent further disclosures of plaintiff's secrets by defendants to others.

Upon the filing of the complaint, a temporary restraining order was made, upon plaintiff's *ex parte* application, enjoining the defendants and their representatives from divulging any of the features of plaintiff's PAR gun and system as disclosed to the defendants in July 1961 and November 1964, from building, using or incorporating any of the features of plaintiff's gun and system in the designs of others, and from using the gun and system in marine geophysical surveys or similar applications.

The disclosure and demonstrations by plaintiff to defendants, the execution of the agreement by and in behalf of the defendants with the plaintiff, as well as the general nature of the negotiations between the parties set forth in the complaint, are admitted in the answer of defendants. Except as aforesaid, however, the allegations of the complaint are denied generally. In his affidavit in op-

position to the pending motion, Beckmann says in part:

"* * * I have never, nor has Alpine, incorporated plaintiff's design into devices built for other persons * * *.

In May and June, 1964, Alpine did build certain noise-making guns for Lamont Geological Observatory and for Hudson Laboratories, both of Columbia University. These guns were built at the customers' requests and in accordance with a sample made by Lamont in its own machine shop and supplied by Lamont to Alpine. Plaintiff's design was not used by Alpine in filling these orders. * * * Neither I nor Alpine has any intention of using plaintiff's design in the future."

The temporary restraining order was made a part of an order to show cause why a preliminary injunction should not be granted, and upon its return, testimony and other evidence was presented in behalf of the respective parties. At the conclusion of that hearing, defendants consented that the temporary restraint should continue pending decision upon the application for the preliminary injunction.

I find from the evidence presented on the return of the order to show cause, the following facts:

Commencing in the 1950s, Bernard Luskin, Chief Engineer of Lamont Geological Observatory of Columbia University (Lamont) and his fellow-employees, Beckmann and Chelminski (later respectively presidents of Alpine and Bolt) collaborated in the development of sound-generating devices for use in the study of oceanographic seismology by Lamont.

By measuring the time elapsing from the moment of the releasing of any of the successive sounds from these sound generating devices until all the echos or returns from that impulse of energy are reflected back from the ocean bottom and detected at the surface, a continuous profile picture is obtained of the topography

of the ocean bottom and the discontinuities thereunder.

Prior to June, 1961, the devices used to generate the sound waves for such profiling functioned electromagnetically, or by means of exploding mixtures of propane and oxygen, or by discharging an electric spark; but each of these systems was found to have unsatisfactory characteristics and effects.

Plaintiff Bolt, per its president Chelminski, and defendant Alpine, per its president Beckmann, have also participated in the development or manufacture of devices by means of which pressurized air is explosively released intermittently into a body of water to create the required impulses of low frequency sound energy, which are transmitted to and through the bottom and are reflected back to a recording device on the surface.

In November, 1960, Lamont received a contract from the United States Navy for the further development of techniques and equipment for oceanographic sub-bottom profiling by means of a sound reflecting system using other than explosives to generate the sound. Lamont's work under the contract was in charge of its senior research associate, John Ewing, a specialist in submarine geophysics involving the use of seismic techniques, i. e., the measurement of acoustic waves traveling in the ocean floor for the ascertainment of the structure and shape of its layers, and the thickness of its overlying sediments. Ewing's studies in preparation for and in the course of Lamont's development work under the Navy contract disclosed that compressed air or gas had been used to generate noise under water, and, upon his return to Lamont on May 16, 1961, from an oceanographic cruise during which gas and other explosives were used as underwater sound generating sources, Ewing determined to employ compressed air as a sound source. Accordingly, in May and June 1961, Ewing and Lamont's mechanical engineer, Zaunere, developed a compressed air device consisting of a chamber with a manually operated valve. While this development was in progress, Chelminski

demonstrated to Ewing an air gun, which he put into the water alongside a ship, pumped it up and discharged it a few times. Chelminski inquired of Ewing whether Lamont would give him a development contract for this device, but was told that it was unlikely because Lamont was at that time already involved on its own account in the same field. Ewing, however, suggested to Chelminski that Beckmann might be interested in his proposal. Ewing and Zaunere continued their development work for Lamont under the Navy contract, and, by the summer of 1964, both of them "felt that we had really started to get a device that could be considered effective and reliable."

In the early winter of 1964, Zaunere actually fabricated by hand, two or three samples of the device schematically disclosed on drawings which were marked as exhibits upon the hearing before me, and which respectively portray a device designed to make a noise by means of the sudden release of compressed air or other gas into a liquid medium. Ewing testified that prior to Zaunere's fabrication of the prototypes for Lamont, in the winter of 1964, Ewing had not seen any drawing of the device which Chelminski had demonstrated to him in June of 1961. Because Ewing estimated that his ten months' testing voyage during the summer of 1964 would consume 20 of his devices, and Lamont's manufacturing facilities were inadequate to produce all of that number, Lamont contracted with Alpine to make some of them, and furnished to Beckmann the necessary drawings for the purpose. I cannot find from the evidence that either Beckmann or Alpine contributed to the development of the Lamont gun disclosed in those drawings except by manufacturing the gun for Lamont under its purchase orders in conformity with its drawings.

Upon the facts found, and for the purposes of the pending application, three questions are presented:

(1) To what extent are Alpine and Beckmann bound by the "Confidential Agreement" of July, 1961?

(2) Does Alpine's conduct violate its obligations under that agreement? and

(3) Has the plaintiff shown an equitable basis for a preliminary injunction?

██ As to the first issue, the Court is, at this juncture, convinced that the plaintiff, Bolt, has shown that it had a trade secret in the device it had developed to generate low frequency sound waves in a water medium by the release of compressed air. A trade secret has been defined by the New Jersey Supreme Court in Sun Dial Corp. v. Rideout, 1954, 16 N.J. 252 at 257, 108 A.2d 442, 445, as follows:

> "A trade secret may consist of a formula, process, device or compilation which one uses in his business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. * * * Its subject matter must not be a matter of public knowledge or of general knowledge within the industry. * * * Although a substantial measure of secrecy must exist, the secrecy need not be absolute and disclosure to employees involved in its use will not ordinarily result in loss of the employer's protection. * * * Novelty and invention are not essential for the trade secret as they are for patentability. * * * And the fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors."

These principles must therefore be taken as established in New Jersey and it is New Jersey's law that governs this case.

██ I find that Bolt disclosed a trade secret to Beckmann and Alpine by demonstrating its device to Beckmann in July, 1961. Sound generating devices operating on compressed air were being developed by others at the time the "Confidential Agreement" was executed, and this fact, in the light of the witness Ewing's comment that he was "particularly interested" in a noise making device using compressed air as a sound source, is persuasive evidence that the principle upon which the plaintiff's device operated was of sufficient novelty and secrecy to conform to the definition of a trade secret on the date of the "Confidential Agreement."

██ Sandlin v. Johnson, 8 Cir. 1944, 141 F.2d 660, and Warner-Lambert Pharmaceutical Co. Inc. v. John J. Reynolds Co. Inc., S.D.N.Y. 1959, 178 F.Supp. 655, affirmed on opinion below, 2 Cir. 1960, 280 F.2d 197, teach that a person to whom a trade secret is disclosed must honor his contract even after the *res* of the secret has become widely and generally known. It follows that Alpine was obligated not to "divulge the design to others, to build or use, or incorporate [*it*] in the design of other devices until a patent has been issued or denied." What, then, is the proper construction of the word "design" as used in the agreement of July 1961? The exact working plan of the devices manufactured by Alpine (for Lamont and others) differs from the design of the Bolt device, although both operate on the same principle and incorporate parts performing similar functions. Thus the construction of the word "design" is a substantial issue and that issue is presently unresolved.

██ In Protexol Corp. v. Koppers Co., 2 Cir. 1956, 229 F.2d 635, plaintiff had a trade secret in a chemical composition the formula of which plaintiff confidentially disclosed to defendant which had been engaged in independent experimentation in the same field. In return for the disclosure, defendant agreed to keep the formula secret. Thereafter defendant secured a patent upon a formula of its own development which contained the same ingredients as those of plaintiff's formula but in different proportions. Plaintiff sought damages and injunctive relief, charging that defendant's disclosures and use of its patented formula violated its agreement to keep plaintiff's formula secret. The evidence on final hearing supported the trial court's finding that the disclosure which evoked the agreement of secrecy was only of the pro-

portions of the ingredients involved. Therefore, defendant's agreement was not violated and the complaint was properly dismissed. A substantially similar question confronts the Court in the case at bar, and since I cannot determine from the evidence presently before me that there is a reasonable certainty that Bolt must succeed at final hearing (see H. E. Fletcher Co. v. Rock of Ages Corp., 2 Cir. 1963, 326 F.2d 13, 17; and Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 2 Cir. 1961, 300 F.2d 745, 747), the application for a preliminary injunction must be and hereby is denied.

Let an appropriate order be presented accordingly.